## DAVIDSON v. MEXICAN NAT. R. CO.

(Circuit Court, E. D. New York. November 14, 1893.)

1. CORPORATIONS—CONTRACTS.

The fact that a railroad company and a construction company have mainly, though not entirely, the same officers and stockholders, does not

render them legally identical, but merely requires a more careful scrutiny of their dealings with each other, where the interests of outside parties are affected.

2. SAME—RAILROAD REORGANIZATION AGREEMENT—CONSTRUCTION.

A provision in a railroad reorganization agreement that there shall be furnished "a sum, not exceeding $217,000, to be applied to liquidate the indebtedness of the existing railway company," is a provision that the sum shall be used as far as it will go, and hence payments subsequently made out of the assets of the company do not go in reduction of the fund, so as to render it pro tanto exempt from other valid debts of the company.

3. SAME.

A railroad reorganization agreement provided a certain sum to be applied in liquidation of existing debts of the railroad company. Just prior to the execution of the agreement an indorser of the company's notes had paid the same, amounting to $40,000. The railroad company had agreed that if the indorser was compelled to pay the notes it would deliver to him 8,000 shares of its stock, or account therefor at $10 per share, (being $80,000.) The indorser did not demand the stock until after the execution of the reorganization agreement, and a reasonable time for the delivery thereof subsequently expired without such delivery. Held, that the fund provided under that agreement was chargeable with $40,000, and no more.

4. SAME—INTEREST—WHEN ALLOWED.

Where a railroad reorganization agreement goes into effect from the date of execution, but no provision is made for dealing with the property, for compensation for the care of it, or for interest on money or debts during the time which will necessarily elapse pending the proceedings to be taken under the agreement, no interest should be allowed for such period upon the various mutual debts and charges of the parties thereto.

At Law. Action by Joseph A. Davidson against the Mexican National Railroad Company to recover money. Tried to the court without a jury. Findings and judgment for plaintiff.

Statement by WHEELER, District Judge:

The trial of this cause having been begun at a term of this court held at the United States courthouse in the city of Brooklyn on the 17th day of March, 1893, before the Honorable Hoyt H. Wheeler, judge, and a jury, and thereupon the parties having, by stipulation in writing, agreed that this cause should be tried by the court, and the case having thereupon been so duly tried before the said judge without a jury, and the parties having submitted their proofs and allegations, the court hereby makes the following findings of fact:

(1) The plaintiff is a citizen and resident of the United States of America and of the state of New York, and upwards of the age of 21 years. The defendant is a railroad corporation, created by and existing under the laws of the state of Colorado, and owning and operating as its principal property the railroad within the republic of Mexico, which is hereinafter called the "Mexican National Railroad."

(2) The Mexican National Construction Company (hereinafter called the "Construction Company") is, and has been since on or about the 1st day of September, 1880, a corporation duly organized and existing under the laws of the state of Colorado. It was so organized for the purpose of building, owning, and operating railroads within the republic of Mexico, and, among other railroads, the said Mexican National Railroad; and ever since its said organization it has been authorized by the said laws under which it was so incorporated, and also by the laws of the republic of Mexico, to, and the said laws provided that it might, construct, equip, operate, maintain, or own railroads within the republic of Mexico, and make contracts for the construction, equipment, operation, maintenance, or ownership of

such railroads, and do any and every act necessary or proper to such construction, equipment, operation, maintenance or ownership.

(3) The Mexican National Railway Company, (hereinafter called the "Railway Company,") from a time prior to the year 1881 until a time after the 1st day of January, 1888, was a corporation duly organized and existing under the laws of the state of Colorado, by which laws, and also by the laws of the republic of Mexico, it was authorized to, and the said laws provided that it might, construct, equip, operate, maintain, or own a railroad or railroads within the republic of Mexico, and especially the Mexican National Railroad. The Mexican National Railroad was constructed by the Construction Company for and upon the employment of the Railway Company, except that on the 15th day of October, 1886, the portion of the said railroad between San Miguel and Saltillo, two points upon the said line, was not entirely finished and in operation. Long prior to the 15th day of October, 1886, the said railroad, so far as thus constructed, was delivered to the Railway Company by the Construction Company, and on that day the Railway Company was the owner and in the possession of and operating the same. The said railroad included a main line running from the city of Mexico to Nuevo Laredo, all within the republic of Mexico, (except that the said portion between San Miguel and Saltillo, as aforesaid, was not entirely finished and in operation,) and included besides certain outlying branches; and there are, and have at all times since the construction of the railroad been, appurtenant thereto, equipment, rolling stock, telegraph and telephone lines, and other usual appurtenances of railroads. The term "Mexican National Railroad," as hereinafter used, will include the said main line, except so much of the said portion between San Miguel and Saltillo as was constructed after 15th October, 1886, and will also include said outlying branches, and also the said equipment, rolling stock, telegraph and telephone lines, and other usual appurtenances, but will not include the portions of the railroad reserved to the Construction Company by the Matheson-Palmer agreement, hereinafter mentioned. The Construction Company, prior to the 15th of October, 1886, had, in the course of such construction and equipment of the Mexican National Railroad, performed work, labor, and services and furnished materials for the said railroad and for the Railway Company.

(4) Prior to the 15th day of October, 1886, the Railway Company had made, issued, and duly and for value negotiated and disposed of certain 6 per cent. gold bonds to the amount of several millions of dollars, and had secured the same by a first mortgage upon the Mexican National Railroad. The laws of Colorado and Mexico authorized such issuance and sale of bonds and the making of such mortgage. Prior, also, to the 15th of October, 1886, the Railway Company had defaulted in the payment of interest upon its bonds, and there was danger that the mortgage would be foreclosed; and the Railway Company was also involved in other pecuniary difficulties and embarrassments. The Construction Company was the owner of a large amount in the said bonds of the Railway Company, and also owned a large part of the stock of the Railway Company. The Construction Company was also the owner of rolling stock, equipment, materials, and supplies originally intended for use upon the said railroad or upon branches thereof, or upon roads connected or intended to connect therewith. The Construction Company was also the owner of a subsidy of several millions of dollars, theretofore granted by the government of the republic of Mexico, upon which payments had from time to time been made, and upon which from time to time thereafter payments were to be made.

(5) From the time of the organization of the Mexican National Railway Company and the Mexican National Construction Company until August 1, 1887, the officers of the two companies were in large part identical. During this period the two companies had the same principal offices in Mexico and New York, the same treasurer, William M. Spackman, the same auditors, the same cashier in New York, the same general manager, the same head bookkeeper in New York, and in part the same directors. During substantially all the time from the organization of the Railway Company and Construction Company until August 1, 1887, the books of account of the two companies were kept under the direction of William M. Spackman, the treasurer of each of the companies.

(6) A contract between the Construction Company and the Railway Company for the construction of the railroad was made, dated May 12, 1881, (defendant's Exhibit No. 35,) and under it the Construction Company undertook and commenced the construction of the railroad of the Railway Company. The Construction Company received for so much of such construction as was done $21,150,000 of the first mortgage bonds, and $22,321,630 of the capital stock, of the Railway Company.

(7) On June 15, 1883, an agreement for the equipment of the railroad to the value of about $2,000,000 was entered into between the Railway Company and the Construction Company, which is plaintiff's Exhibit F, and on the next day an agreement was entered into between the Construction Company and the Guarantee Trust & Safe-Deposit Company of Philadelphia for the pledge of the equipment and its use to this trust company to secure not exceeding 2,000 equipment trust certificates of $1,000 each, with coupons for interest, to be delivered to the Construction Company to an amount not exceeding the cost of the equipment, and 1,713 of these certificates, amounting to $1,713,000, with coupons, were delivered to the Construction Company pursuant to this agreement. The Construction Company did not complete the railroad under the contract dated May 12, 1881, and a further contract was entered into between the Construction Company and the Railway Company for that purpose, dated May 1, 1884, (defendant's Exhibit No. 18,) by the terms of which the Railway Company was, among other things, to deliver to the Construction Company $13,437,000 of its second mortgage debenture bonds; and the Construction Company was, among other things, to surrender and yield up, or cause to be surrendered and yielded up, for cancellation so many of the equipment trust certificates as it then possessed and could surrender, and as should thereafter come into its possession or control so that it could surrender the same, as set forth. The $13,437,000 of debenture bonds were delivered by the Railway Company to the Construction Company, according to the terms of the contract. The Construction Company had $232,200 of equipment trust certificates and coupons, mentioned in the contract, but did not surrender or yield up but $25,200 thereof to the Railway Company itself.

Under date of July 31, 1884, an account was opened on the ledger of the Railway Company in reference to the equipment trust certificates and coupons as follows:

Dr. Equipment Trust Certificates and Coupons Receivable:

1884. July 31. To Mexican National Construction Co., contractor ............................................... $232,200

The Construction Company delivered to the Railway Company in August, 1884, and December, 1884, $25,200 paid coupons due June 1, 1884, upon the certificates, which sum of $25,200 was credited by the following entries made in this account:

Cr.

1884. Aug. 31. By equipment trust securities................... $     980
1884. Dec. 31. By equipment trust securities...................    24,220
Balance...............................................   207,000
                                                       _____
                                                        $232,000

Dr.

1885. Jan. 1. To balance..................................... $207,000

This reduced the balance of such account on and after January 1, 1885, to the sum of $207,000, at which sum it stood on the books of the Railway Company from January 1, 1885, until May 31, 1887. The balance sheet of the Construction Company for June 30, 1886, (defendant's Exhibit 29,) after an enumeration of bonds, stocks, and other securities owned by the Construction Company, including the equipment trust certificates and coupons, to the amount of $713,000, contained the following entry: "Less equipment trust certificates and coupons assigned to Mexican National Railway Company, $207,000."

(8) After the making of this contract between the Construction Company and the Railway Company, dated May 1, 1884, the Construction Company proceeded further with the work of construction of the railroad, up to the 15th of October, 1886, and delivered it as it was completed to the Railway Company, but had not completed a portion of the line about 350 miles in length between San Miguel and Saltillo; and, as compensation for such construction, the Construction Company had received the first mortgage bonds, the second mortgage debenture bonds, and nearly all the issued capital stock of the Railway Company.

(9) The Railway Company became embarrassed, could not meet the interest due on its bonds, and in the summer of 1886 was insolvent.

(10) On or about the 26th December, 1885, the Railway Company, desiring to borrow $40,000, and being unable to secure the money upon its own credit or upon the security of the property of its own, requested the Construction Company to indorse notes of the Railway Company for that sum of money, and to lend to the Railway Company certain equipment trust certificates and certificates of shares of stock of the Railway Company, as hereinafter mentioned, belonging to the Construction Company, to be used by the Railway Company as security to the lender of the money. Thereupon the Railway Company made its eight promissory notes, each bearing date 26th December, 1885, each for $5,000, each payable to the Construction Company or order, one year after date, with interest at 8 per cent. per annum, but with provision for earlier payment at the option of the Railway Company. These notes the Construction Company, upon the request and for the benefit and accommodation of the Railway Company, but without other consideration, duly indorsed. Upon and in consideration of these notes and the securities pledged, and the eight contracts or calls given therewith, as hereinafter mentioned, one Charles S. Hinchman, of Philadelphia, loaned to the Railway Company the sum of $40,000. As security for such loan and the payment of the said notes, the Construction Company, upon the request of the Railway Company, delivered to the said Charles S. Hinchman the following securities, which were the property of the Construction Company, namely, certificates for $30,000 shares (each of the par value of $100) of the capital stock of the Railway Company, and $160,000 in par value of equipment trust certificates of the Railway Company. Upon the request of the Railway Company, the Construction Company at the same time delivered to the said Charles S. Hinchman, who required the same as a condition of making the loan, eight contracts, each of which was in the following form, to wit:

"The bearer may call on the Mexican National Construction Company, 32 Nassau street, New York, for one thousand shares of the Mexican National Railway Company at five dollars ($5.00) per share at any time within one year from this date, said railway stock being pledged as part collateral for a note of the Mexican National Railway Company of even date herewith for $5,000, payment of which may be anticipated on the first of any month by notice on the first of the preceding month. This call is to be satisfied out of said pledged stock, either by arrangement between the holder hereof and the holder of said note, or by the said month's notice through the company.

"Dated New York, December 26, 1885. Expires December 26, 1886.

"The Mexican National Construction Co.
"By Walter Hinchman, President."

The said notes were indorsed and delivered, as aforesaid, by the Construction Company, and the said equipment trust certificates and certificates of stock with the said eight contracts or calls were likewise delivered, as aforesaid, in pursuance of an agreement made between the Construction Company and the Railway Company immediately prior to the making of the said notes, in and by which the Railway Company, in consideration of such indorsement and such loan of the said securities, agreed to return to the Construction Company the said 30,000 shares of stock and the said $160,000 in par value of equipment trust certificates, whether such calls or options given by the Construction Company in respect of 8,000 shares of the said stock should be exercised or not; and, if such options should be exercised,

or the lender of the money should call and take such shares of stock at the rate of $5 per share, as mentioned in said contracts or calls, then that the Railway Company should either return such 8,000 shares of stock, or account therefor at the rate of $10 per share, and that the Railway Company should keep the Construction Company harmless and indemnified against any liability arising from such indorsement by the Construction Company of the said notes. Prior to the maturity of the said notes, the said Charles S. Hinchman exercised the option given him by the said 8 contracts or calls, and purchased thereunder 8,000 shares of stock at $5 per share, whereby he was fully paid by the Construction Company the principal amount due upon the said 8 notes.

The inequality in favor of the said lender of the money had to be yielded to because of the necessities, embarrassments, and impaired credit of both companies. No fraud or fraudulent oppression is found in respect to the transaction. The said Charles S. Hinchman called for and took up the said 8,000 shares of stock, being thereby so paid the amount due upon the said notes at the times and in installments, as follows:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 29th Sept., 1886. | 2,000 shares being thus paid | | | | ...........$10,000 of notes. | | | |
| 4th Oct.   " | 1,000   "   "   "   " | | | | .............. 5,000   "   " | | | |
| 5th   "   " | 1,000   "   "   "   " | | | | .............. 5,000   "   " | | | |
| 6th   "   " | 1,000   "   "   "   " | | | | .............. 5,000   "   " | | | |
| 7th   "   " | 2,000   "   "   "   " | | | | .............. 10,000   "   " | | | |
| 13th   "   " | 1,000   "   "   "   " | | | | .............. 5,000   "   " | | | |
| | 8,000 | | | | $40,000 | | | |

Thereafter, and on the 22d day of October, 1886, the Construction Company demanded that the Railway Company return such 8,000 shares of stock, or its equivalent in cash at $10 per share, in accordance with the agreement hereinabove stated. The Railway Company did not pay any part of the amount due upon the said notes. Nor did it within a reasonable time, or at any time, return to the Construction Company any part of the said 8,000 shares of stock; nor did it at any time account therefor at the rate of $10 per share or at all. Such reasonable time for such return to the Construction Company had expired prior to the 1st day of August, 1887.

In the said indebtedness of $111,454.08 there is not included any sum for or on account of the said 8,000 shares or the said notes for $40,000, or any part of them.

(11) In view of the situation, negotiations were entered into in the summer of 1886 for a reorganization of the Railway Company and its liabilities, in which Messrs. Matheson & Co., of No. 3 Lombard street, London, England, represented certain holders of the first mortgage bonds of the Railway Company, and H. W. Smithers, of London, England, was their agent, and W. J. Palmer, president of the Railway Company, represented the Railway Company, the Construction Company, and certain other holders of these first mortgage bonds. On the books of the Railway Company was an account called "Individuals and Companies," containing charges and credits with those with whom the Railway Company did not have separate accounts, which was a well-known method among railroad men of keeping such accounts. On August 31, 1886 those engaged in the negotiations desired to know the amount of the floating debt of the Railway Company, and, upon inquiry made by Smithers and of Palmer as to the amount of it, a statement in relation thereto was asked of and in good faith made in writing by Mr. Spackman, the treasurer of the Railway Company and of the Construction Company, and by him handed with a letter to Palmer, who delivered the statement and letter to Smithers. The said letter and the said written statement of the floating debt of the said Railway Company are as follows:

"New York, August 31, 1886.

"General W. J. Palmer, President—Dear Sir: As requested, I inclose herewith statement of the floating debt of the Mexican National Railway Co., as shown by its books so far as written up, to wit, June 30, 1886.

"Very truly yours,                         Wm. M. Spackman, Treasurer."

"Floating Debt Mexican National Railway Co., Omitting Maturing Coupons on its First Mortgage Bonds, Rental of Equipment and Rental of Leased Lines.
As of June 30, 1886.

| | | |
|---|---:|---:|
| Vouchers | | $ 37,168 18 |
| Pay rolls | | 66,808 05 |
| Foreign roads | | 108 57 |
| Bills payable | | 43,745 19 |
| Individuals and Co's | | 110,731 98 |
| Unclaimed wages | | 2,169 14 |
| Tex. Mex. Coups. outstanding | $ 4,410 00 | |
| Tex. Mex. Coups. maturing July 1, '86 | 30,440 00 | 34,850 00 |
| | | $295,581 11 |

Less:

| | | |
|---|---:|---:|
| Agents and conductors | $25,967 98 | |
| Stamp account | 313 07 | |
| U. S. mail | 2,403 70 | $28,684 75 |

Less cash:

| | | | |
|---|---:|---:|---:|
| N. Y. office | $ 6,072 92 | | |
| B. W. Thacher, cashier | 27,453 30 | | |
| H. P. Webb, cashier | 21,403 96 | | |
| | | $54,930 18 | |

Less due:

| | | | |
|---|---:|---:|---:|
| B. W. Thacher, department account | $3,396 40 | | |
| London agent | 945 45 | 4,341 85 | 50,588 33 |
| | | | $79,273 08" |

The amount of $110,731.98 mentioned as due to "Individuals and Companies" by the said Railway Company on the said statement made by the said Spackman was made up as follows:

| | | |
|---|---:|---:|
| Due to Brownsville & Gulf Company | | $ 1,086 31 |
| Due Tex. Mex. Northern Railway | | 52 50 |
| Due insurance | | 643 93 |
| Due Construction Company | | 145,407 38 |
| | | $147,190 12 |
| Due by individuals and companies | $36,277 13 | |
| Due marine insurance | 47 | |
| Due Brownsville Ferry Company | 180 54 | 36,458 14 |
| | | $110,731 98 |

At this time this item: "Equipment trust certificates and coupons receivable, $207,000,"—stood on the balance sheet of the Railway Company of June 30, 1886, in the books of that company.

On or about the 15th day of October, 1886, the agreement called the "Matheson-Palmer Agreement" (plaintiff's Exhibit A) was executed; and upon the faith of the correctness of this statement as to the floating debt of the Railway Company those engaged in the negotiations inserted in it the clause contained in the fifth paragraph thereof, which reads as follows: "And, a sum not exceeding $217,000, to be applied to liquidate the indebtedness of the existing Railway Company." Neither on August 31, 1886, nor at the time of the making of the said Matheson-Palmer agreement, did Smithers inquire into the details of the statement of the floating debt of the Railway Company further, or know that the amount of $110,731.98, mentioned on statement as due from the Railway Company to individuals and companies as of June 30, 1886, was made up by including a debt due from the Railway Company to the Construction Company of $145,407.38; or know that there was upon the books of the Railway Company an entry as of a balance due to the

Railway Company by the Construction Company of $207,000 equipment trust certificates and coupons.

(12) On October 1, 1886, the Construction Company stood credited on the books of the Railway Company, and the Railway Company stood charged on the books of the Construction Company, with $104,244.10, which was correct, and, with interest, amounted to $111,454.28, which was then due from the Railway Company to the Construction Company.

(13) While the reorganization proceedings were going on under the Matheson-Palmer agreement, and until 1st August, 1887, the possession of the railroad remained as before, and it was operated and improved in the name of the Railway Company, and dealings with the Construction Company were continued as before the making of that agreement, awaiting a determination of whether the reorganization proceedings provided for in that agreement would be carried out, and the disposition of the property under the agreement if they should be. They were carried out, and the defendant entered into the possession of the railroad, and began the operation of it on that day. During this 10-months period from October 1, 1886, the date agreed to for this purpose, until August 1, 1887, there were various transactions about the operation and improvement of the railroad with the Construction Company pursuant to the contracts between the Railway Company and the Construction Company, in which the Construction Company advanced and paid moneys or value to or for the use or benefit of the railroad, and upon request furnished materials for it, and moneys were had and received for and to the use of the Construction Company; and divers payments of money were made to the Construction Company. Upon these transactions during this period the Construction Company is charged with these amounts, mentioned in defendant's Exhibits Nos. 21 and 22:

| | |
|---|---:|
| Cash | $106.214 42 |
| Materials from shops and stores | 143 246 74 |
| Sundries, together | 14,432 70 |
| Cash on voucher | 190,624 42 |
| Cash | 5,677 95 |
| Use of drill | 1,309 75 |
| | $461,505 98 |

And the Construction Company is credited with these amounts:

| | |
|---|---:|
| Vouchers and cash, as shown in defendant's Exhibits Nos. 21 and 22 | $219,246 60 |
| Collected on mortgages | 8,612 69 |
| Reorganization expenses | 2,530 74 |
| Sundries and cross entries | 987 45 |
| Payments to Mendez | 12.165 61 |
| El Salto lien | 8,199 02 |
| Value of cars, and setting up the same | 133,983 33 |
| New work and services | 22,755 66 |
| Zacatecas & Colima earnings | 10,526 70 |
| Bonds for Mendez | 4,100 00 |
| | $423,107 80 |

Balance in these transactions during this period against Construction Company.................................. $ 38,398 18

Of these items $11,811.45 of the payment of $12,165.61 to Mendez, $444.72 of the El Salto lien, and the $4,100 for bonds for Mendez,—in all, $16,356.17,—accrued wholly before October 1, 1886; $5,815.73 of the remainder of the El Salto lien is the proportion of six months' interest due November 15, 1886, for the 4½ months prior to October 1, 1886; and $1,938.57 the residue, is the proportion of the 1½ months between October 1 and November 15, 1886. But the whole of all these items was paid or furnished in good faith during the 10-months period. If the Construction Company should not be credited here for the payments of what accrued wholly before October 1, 1886, the balance against it would be $54,754.35; if not for either this or the proportion

of interest for the 4½ months before that date, the balance against it would be $60,570.08.

(14) On or about the 5th day of February, 1887, the defendant was incorporated under the laws of Colorado, and in the months of February, March, April, and May, 1887, foreclosure proceedings were taken in the courts of the republic of Mexico to foreclose the first mortgage upon the property of the Railway Company, and with the assent and assistance of the Construction Company therein it was foreclosed; and on or about the 24th day of May, 1887, a conveyance of the railroad, with the exception mentioned in the Matheson-Palmer agreement, in which the Construction Company joined, was executed and delivered to the defendant.

(15) The Matheson-Palmer agreement provided (article 8) that the Construction Company should assign to the new Railway Company, which the defendant became, all rolling stock and equipment then upon the lines, except that upon the Zacatecas and Colima divisions, by assigning all equipment certificates, which were the equipment trust certificates before mentioned, so that it should be vested with the sole title to this rolling stock and equipment. Pursuant to this provision the Construction Company delivered the whole issue outstanding of equipment trust certificates and coupons to the Guarantee Safe Deposit Trust Company, including the $207,000 thereof to be canceled, and they were thereby yielded up and canceled, of which all those interested had notice, and that account was balanced on the books of the Railway Company by entry: "1887, May 31. By Matheson-Palmer agreement. $207,000."

(16) On or about the 1st of June, 1887, the defendant executed and delivered to Hugh M. Matheson and Charles Magniac, as trustees, a certain first mortgage or trust deed for the security of the first mortgage bonds of the defendant, and since the execution of this mortgage the defendant has issued $12,-500,000 in par value of principal of first mortgage bonds, and of the proceeds thereof $217,000 was before January 1, 1888, received by the defendant, to be applied to liquidate the indebtedness of the former existing railway company according to the provisions for that purpose in the fifth article of the Matheson-Palmer agreement.

(17) The defendant has substantially complied with all its part of the provisions of the Matheson-Palmer agreement, except the liquidation of the indebtedness of the Railway Company to the Construction Company.

Between October 1, 1886, and August 1, 1887, there was paid from the current assets of floating debts of the Railway Company contracted prior to that time, and entered on the books of the Railway Company:

| | | |
|---|---:|---:|
| Tex. Mex. coupons | $ 32 690 | 00 |
| Vouchers | 49 844 | 42 |
| Pay roll | 68,199 | 96 |
| Bills payable | 850 | 00 |
| Foreign roads | 129 | 07 |
| Unclaimed wages | 1,806 | 49 |
| Individuals and companies | 5,758 | 63 |
| | $159,278 | 57 |

And of such debts not entered on the books of the Railway Company:

| | | | | |
|---|---:|---:|---:|---:|
| On vouchers N. Y. and Mexico | $28,073 | 53 | | |
| Less correction admitted | 662 | 12 | | |
| | | | $27,411 | 41 |
| For materials used prior to October 1, 1886, but paid for after that date | | | 5,755 | 75 |
| One-half of Tex. Mex. coupon of Jan. 1, 1887 | | | 2,760 | 00 |
| One-half of Corpus Christi coupon of Jan. 1, 1887 | | | 12,460 | 00 |
| Interest paid on notes | | | 2,418 | 40 |
| On equipment trust certificates | | | 285 | 83 |
| | | | $51,091 | 39 |

The Construction Company has paid of debts of the Railway Company accrued before October 1, 1886, the several notes before mentioned, as stated, $40,000; to Mendez, for services as counsel, as stated, $11,811.45; and for bonds for Mendez, as stated, $4,100. There has been collected since October 1, 1886, of current assets arising from the operation of the railroad before that date, as follows:

| | |
|---|---:|
| Agents and conductors | $ 17,895 13 |
| Stamp account | 253 73 |
| United States mails | 2,245 42 |
| Cash | 58,894 79 |
| Brownsville Ferry Company | 165 88 |
| Individuals and companies | 39,936 28 |
| | $119,391 23 |

And there remained, at the time of the commencement of this action, of such assets uncollected and uncollectible the sum of $34,244.40.

(18) The defendant itself has paid of the floating indebtedness of the Railway Company existing October 1, 1886, since August 1, 1887, $26,459.96. This is all that the defendant has paid directly from the fund of $217,000.

(19) From a time prior to July 1, 1890, to a time subsequent to December 1, 1891, the defendant was the owner of certain bonds of the republic of Mexico to the amount of $75,000, which bonds were deposited in the Banco Nacional of Mexico as security to the Mexican government for the completion of certain lines in the republic. During the same period the interest became due on the bonds as follows, viz.:

| | |
|---|---:|
| July 1, 1890 | $900 |
| Dec. 1, 1890 | 900 |
| July 1, 1891 | 900 |
| Dec. 1, 1891 | 900 |
| U. S. Cy | $3,600 |

—Which amounts the Construction Company collected and received, and has not paid to the defendant.

(20) After the receipt by the defendant of the sum of $217,000, hereinbefore mentioned, the defendant, on or about the 14th day of April, 1890, entered into agreement of arbitration with the Construction Company, a copy of which is annexed to the complaint, and entitled "Arbitration Agreement." After the making of the said arbitration agreement the Construction Company and the defendant proceeded from time to time with the hearing and taking of testimony before the arbitrators therein named, as in the said agreement provided, until the same was revoked by the defendant on the 16th day of July, 1891, to which the time for completing the arbitration had been by agreement extended; and the Construction Company in all respects on its part fully performed the arbitration agreement until the same time, and paid half of the expenses thereof, amounting to $1,731, on expectation that it would be carried out. The arbitration was revoked by the defendant because of a decision by the arbitrators to receive evidence of claims in favor of the Construction Company against the Railway Company, which the Construction Company insisted should be set off against claims made by the defendant in behalf of the Railway Company against the Construction Company; and because the defendant preferred to revoke, rather than to go on. No decision was made as to any disposition to be made of these claims if proved, and the evidence is found to have been admitted for the better understanding of the matters submitted, and not for the purpose of going outside of them or of the submission. No misconduct or ground for charging misconduct or departure from the submission is found.

(21) After the happening of all the matters aforesaid, and before the commencement of this action, the Construction Company duly assigned, transferred, and set over unto the plaintiff the causes of action of the Construction Company against the defendant, hereinbefore set forth, and all the claims of the Construction Company against the defendant arising out of

the said provisions of the Matheson-Palmer agreement with reference to the fund or sum of $217,000, mentioned therein, as aforesaid, and all moneys due or to become due upon the claims, or either of them, and every right of action of every description whatsoever of the Construction Company against the Railway Company by reason of such claims, or any of them, and also the entire interest and right of every description whatsoever of the Construction Company in and to the fund or sum of $217,000, and also all claims of the Construction Company against the defendant upon, and for breach of, the arbitration agreement.

And these facts are now placed upon record herein.

Edward M. Shepard, for plaintiff.
Treadwell Cleveland, for defendant.

WHEELER, District Judge, (after stating the facts.) This finding of facts has been made pursuant to section 649 of the Revised Statutes of the United States. Upon these facts the defendant is liable for the debts of the Railway Company to the Construction Company, on whose rights the plaintiff stands, by force only of the express provision stated in the Matheson-Palmer agreement. The defendant insists that payments of such debts existing October 1, 1886, made from the current assets of the Railway Company or by the Construction Company, are to be reckoned in diminishing the limit of the provision for such debts. If the provision had been that such debts should be paid to an amount not exceeding $217,- 000, this claim might have been well founded; but it was of "a sum not exceeding $217,000, to be applied to liquidate the indebtedness of the existing Railway Company." This is not a mere provision that not exceeding that amount of debts shall be paid, but a provision of that sum to be applied so far as it will go to the liquidation of such debts. The Railway Company was, in the contemplation of the parties to the agreement, to disappear. The defendant was to become its successor, and its net debts were to be provided for. This fund seems to be such a provision. It was to be added to the assets, not substituted for them; and it is to be resorted to so long as it may last for the payment of such debts not otherwise paid. The defendant has by the finding applied only $26,459.96 of this fund in liquidation of such debts. The balance, of more than $190,000, with interest since it was received, is left to be resorted to.

That the Railway Company correctly stood a debtor to the Construction Company upon the books of both on October 1, 1886, for $104,244.10, is found as a fact. The interest computed to that day, $7,210.18, has not, apart from the principal, been questioned; which makes then due $111,454.28. The identity of stockholders and officers, the relation of the two companies to each other and to the subject-matter, and the means by which the provision came into the agreement, are relied upon to exclude the Construction Company from it.

The identity of stockholders and officers found did not make the corporations legally identical. They had separate stockholders and officers also, and separate property and dealings. It merely suggested and required more careful scrutiny of their transactions

with each other, in which still others became interested, which has been given. They could owe each other. The Railway Company did owe the Construction Company, and what was so owed was an indebtedness. The agreement nowhere expressly, or, as understood, impliedly, distinguishes between the construction company and other creditors in respect to floating or other indebtedness. That this debt was placed, in the statement furnished, among those to individuals and companies, when it might perhaps more appropriately in railroad bookkeeping have been separated, is not found to have deceived any one. The amount, not the form, of the indebtedness was what was important to the business then in hand.

The Matheson-Palmer agreement was not signed till October 15th, although, as to accounts which were dated as of the 1st of each month, the reckoning is by agreement made as of October 1, 1886. Before October 15th the Construction Company had, as accommodation indorser, paid the Hinchman notes, amounting to $40,000, for the Railway Company. The agreement as to dates does not affect this transaction, whereby the Railway Company was indebted to the Construction Company for so much paid for it, at the time of the execution of the Matheson-Palmer agreement. This indebtedness would come within the provision of $217,000 to liquidate the indebtedness of the Railway Company made in that agreement, and makes the indebtedness of the Railway Company to the Construction Company provided for $151,454.28.

The Railway Company had agreed to deliver to the Construction Company 8,000 shares of stock of the Railway Company to replace that with which the notes were paid, or pay $10 per share therefor. The stock was not demanded till October 22d, after the Matheson-Palmer agreement was signed, and has never been delivered or paid for. The plaintiff claims that the debt of the Railway Company to the Construction Company growing out of this transaction became $80,000 of indebtedness provided for in the $217,000. The defendant insists that no part of it, and especially that but $40,000, is so provided for. The Railway Company could have extinguished the liability at any time before the holder exercised his option, by paying the notes. This was the situation during a part of the time of the negotiation of the Matheson-Palmer agreement, and the liability did not become $80,000 till after the execution of that agreement. As an indebtedness it was only $40,000 at the time of that execution, within the terms of the provision for the liquidation of indebtedness. The further liability could be satisfied by the delivery of the stock, which, as the company was insolvent, would have no actual value. Under these circumstances this excess of liability beyond the $40,000 of original indebtedness does not seem to be such an actual indebtedness as to come within the terms of the provision for the liquidation of indebtedness, but rather to be a penalty for nonpayment of the notes. The Matheson-Palmer agreement, when made, became operative upon all the property which it would affect, and those in possession would hold it for those who should ultimately become entitled to it, with

no right to incumber it beyond what would be necessary for its preservation and use; and this liability of the Railway Company, accruing after the making of the agreement for not meeting its indebtedness, would not seem capable of being made a charge upon the balance accruing from the assets of the Railway Company against the Construction Company, so as to prevent its going in reduction of the indebtedness to the Construction Company provided for in the agreement.

Whether the payments made by the Construction Company to Mendez for services, for bonds for Mendez, and on the El Salto lien, during the 10-months period, which have been credited to that company in the transactions of that period, should not at all, or only in part, be so credited, is not material as the figures stand. All of such payments that should be disallowed there because they accrued before that period would become a part of the indebtedness existing before. If they should be taken from there, and added to the debts, they would be increased just as much as the balance against the Construction Company during that period to be deducted would be increased. Reckoned either way, the balance left due the Construction Company would be $113,056.10.

The defendant, however, claims that the transaction in respect to the equipment trust certificates created a debt or liability of the Construction Company to the Railway Company, existing both on October 1 and October 15, 1886, and large enough to meet and extinguish the debts and liabilities of the Railway Company to the Construction Company at either of those times, and more. But the Construction Company had not purchased these certificates, nor agreed to pay anything for them; and the transaction did not create any debt either way. The certificates were not to be yielded up to the Railway Company to be used, but to be canceled; and the Railway Company had no right to use them otherwise. If the failure to yield them up created any liability, it would have been for only nominal damages, for the Railway Company had suffered nothing from the failure; and the certificates have since been delivered and canceled under the Matheson-Palmer agreement, to which the Railway Company was a party, which was the same in effect as if they had been delivered to and canceled by the Railway Company itself.

The Matheson-Palmer agreement, when made and executed, began to operate immediately upon the rights of all the parties to it as between each other, and upon the title to property within its reach; but the various proceedings to be taken under it would require considerable time. Still no provision was made for dealing with the property, for compensation about the care of it, or for interest on money, or debts among the parties, which would be in abeyance. The whole related to one object, and in effect would date from the beginning, like a term of court, or a session of parliament, at common law. Therefore no interest would seem to be chargeable meanwhile as between the parties. The period by the receipt of the money for the liquidation of the debts of the Railway Company ended before January 1, 1888,—how long before

does not appear. After that the defendant had the money with which to pay these debts, and should be charged with interest on what remained unpaid after deducting what the assets of the Railway Company paid, $113,056.10, which, to November 14, 1893, is $39,814.57, amounting to $152,870.67.

Upon the finding no question seems to be left but that the defendant became liable to the Construction Company for what the latter laid out and lost by the making and revoking of the arbitration agreement, which was $1,731; and with interest from revocation, $241.77, amounts to $1,972.77.

The $3,600 received by the Construction Company, belonging to the defendant, is understood to have arisen from the same transactions, and to be proper to be deducted. As this amount was much less than the interest then accrued in favor of the Construction Company, no interest is allowed upon it.

These sums of $152,870.67 and $1,972.77, amounting to $154,843.44, less $3,600, leave due $151,243.44.

Let judgment be entered for the plaintiff for $151,243.44.